OPINION OF THE COURT
Bentley Kassal, J.
ISSUE
The Real Estate Industry Stabilization Association has approved and recommended a standard rider clause for rent-stabilized, residential apartments in New York City which is included in most such leases. This rider permits the landlord to increase a tenant’s rent during the leasehold term on the *944 basis of a rent increase order by the New York City Conciliation and Appeals Board ("CAB”), the regulatory agency.
Plaintiffs ("Tenants”) challenge the validity of the rider, as applied to them, on the grounds that it is unconscionable and results in a fraud on the tenant since at the time of the execution of the leases, they were not informed of the pendency of a rent increase application.
FACTS
The factual questions presented by this motion have been substantially narrowed by extensive pretrial disclosure. As a result, the essential facts for the disposition of this motion have been conceded by the defendants.
The defendants (collectively "the landlord”) own and manage the apartment building at 2 Fifth Avenue in Manhattan, which is subject to the Rent Stabilization Law of 1969 (Administrative Code of City of New York, § YY51-1.0 et seq.) and the Emergency Tenant Protection Act of 1974 (L 1974, ch 576, § 4). On November 25, 1974, the landlord filed with CAB an application for a "hardship increase” of 18.38% pursuant to section YY51-6.0 of the Rent Stabilization Law of 1969. At the time of the filing of the application, the existing tenants were given notice of the application and an opportunity to respond. Three years later, after substantial delay at the CAB and a mandamus proceeding pursuant to CPLR article 78 (see Matter of 2 Fifth Ave. Co. v New York City Conciliation & Appeals Bd., 57 AD2d 106), the CAB authorized a rent increase of approximately 14.01%, retroactive to January 25, 1975. (However, the landlord entered an agreement with a majority of the tenants stipulating to an 11% increase effective January 1, 1978, which was incorporated in the order of the CAB.)
In the three-year interim, subsequent to the filing of the application for a comparative hardship rent increase in November, 1974, and before the final CAB order on December 15, 1977, the 13 tenants herein entered into leases for apartments at the premises at a specific rental but bearing the following rider (hereafter "Rider 3”):
"Par. 3. That where Landlord has proper cause and ground to apply to the Conciliation and Appeals Board for relief, and where, upon due application, Landlord is found to be entitled *945 to an increase in rent over and above the amount set forth in Par 1 and 2 above, the parties agree:
"(a) To be bound by the determination of the Conciliation and Appeals Board;
"(b) That where the Conciliation and Appeals Board has granted an increase in rent, the tenant agrees to pay such increase in the manner set forth by the Conciliation and Appeals Board;
"(c) Anything contained in this Par. 3(a) and (b) to the contrary notwithstanding, it is distinctly understood and agreed that in the event that an order is issued increasing the stabilization rent because of owner hardship, the tenant may, within thirty (30) days of receipt of a copy of the order by the Conciliation and Appeals Board, cancel his lease on sixty (60) days’ written notice to the Owner. During said period, the cancelling tenant may continue in occupancy at no increase in rent.”
The specific language is that of a model rider recommended by the Real Estate Industry Stabilization Association, pursuant to the following provisions of the Code of the Real Estate Industry Stabilization Association ("RSC”):
"Nothing contained in the Code shall prohibit the owner from inserting a provision in any lease authorizing a payment in excess of the stabilization rent in renewal or vacancy leases based upon an order increasing the stabilization rent based on owner’s hardship.” (RSC, § 20, subd [b].)
"Any lease may contain a clause which provides for an increase in the stabilization rent during the term of said lease on one of the following conditions:
"(1) pursuant to an order of-the CAB; or
"(2) that owner and tenant have agreed to be bound by any determination of the CAB affecting the tenancy during the term of said lease; provided, however, that nothing herein shall limit the right of the parties hereto to judicial review;” (RSC, § 42B).
Although the tenants admittedly executed their leases with this rider, the landlord failed to advise them of the pendency of the application for the 18.38% comparative hardship increase. Accordingly, they argue that it would be unconsciona *946 ble to construe Rider 3 so as to permit the comparative hardship increase order to modify the specific lease rentals.*
THE LAW OF UNCONSCIONABILITY
On this motion for declaratory judgment voiding the effect of Rider 3, the plaintiffs rely principally on section 235-c of the Real Property Law which authorizes the court to refuse to *947 enforce an unconscionable clause in a lease. That section provides:
"1. If the court as a matter of law finds a lease or any clause of the lease to have been unconscionable at the time it was made the court may refuse to enforce the lease, or it may enforce the remainder of the lease without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.
"2. When it is claimed or appears to the court that a lease or any clause thereof may be unconscionable the parties shall be afforded a reasonable opportunity to present evidence as to its setting, purpose and effect to aid the court in making the determination.”
While no standards of unconscionability are provided in section 235-c of the Real Property Law, it is basically a statutory codification of the common-law doctrine of unconscionability, which had previously been applied to contracts of sale by section 2-302 of the Uniform Commercial Code. (See Governor’s Memorandum on approving L 1976, ch 828, NY Legis Ann, 1976, p 406; see, also, Tai On Luck Corp. v Cirota, 35 AD2d 380, app dsmd 29 NY2d 747; Seabrook v Commuter Housing Co., 72 Misc 2d 6, affd 79 Misc 2d 168.)
The principal elements of the doctrine are an absence of meaningful choice on the part of one of the parties and contract terms unreasonably favorable to the party seeking enforcement. (See, generally, Williams v Walker-Thomas Furniture Co., 350 F2d 445.) Absence of meaningful choice must be determined by examining the circumstances surrounding the execution of the lease, some factors tending to demonstrate an absence of meaningful choice, include, inter alia: a gross inequality of bargaining power; a disparity in the intelligence, education, experience or language ability of the parties; lack of clarity of the language of the lease; deception, fine print or other techniques for obfuscating the intended effect of a provision; and a lack of choice on the part of one of the parties. Reasonableness or fairness of the provisions must also be viewed in terms of the circumstances existing at the time of the execution of the lease. The test as to this element is far from simple, but the more absolute and unnecessarily one-sided the benefit is to one party to the transaction, the more likely it is that the court will find it to be unconscionably unfair and unreasonable.
*948 FINDINGS
1. Absence of Meaningful Choice
The landlord aruges that there was no absence of meaningful choice because Rider 3 is clear and the tenants are sophisticated, intelligent and highly educated people, including, inter alia, lawyers, corporate executives, a psychotherapist, a physician, a psychologist and a college professor.
As to the latter point, while education, intelligence and language ability are factors to be considered, they do not preclude a finding of unconscionability based upon other considerations, such as where the language employed is intentionally deceptive by way of concealment or misrepresentation of critical facts or so ambiguous that it cannot be reasonably construed as favoring the party who offered it.
Rider 3 clearly gives notice that the landlord may make future applications for increases, but the landlord’s claim that this should put the tenant on notice that there may be pending applications is not supported by the language employed. Thus, without some further notice by the landlord of the pendency of the application at the time of entering the lease, the tenants had no meaningful choice, or for that mátter, any choice since they had no knowledge of the true facts. In simple contract terms, it cannot be said that there was a meeting of their minds on this provision — one party lacked knowledge of key facts in the possession of the other party.
Although not enacted at the time these leases were entered, it should be noted that our State now has adopted a "plain language” law (General Obligations Law, § 5-702, L 1977, ch 747, amd L 1978, ch 199) which provides that leases for residential property be written "in a clear and coherent manner” (General Obligations Law, § 5-702, subd a, par 1). The public policy supporting that requirement is equally applicable in principle here.
2. Unreasonableness
The unreasonableness of Rider 3, as the landlord seeks to enforce it here, is readily apparent. It would permit the landlord to "mousetrap” a tenant by agreeing to a low rental while one or more applications for substantial rental increases may be pending. Here the outstanding application sought an increase of almost 20%, a sum which is significant by any measure.
*949 Although there apparently are no current regulations requiring notice to a rent stabilized tenant of pending rental applications, it is noteworthy that under the original regulatory provisions of rent control, such requirements did exist. (See Administrator’s Interpretations Nos. 3, 6; Rasch, New York Landlord and Tenant, Rent Control vol, pp 560-562, 564-565; Melikian v Berman, 58 Misc 2d 178.)
This is not to say that the failure to notify tenants of a pending rent increase application rises to a level of a denial of due process, as tenants also claim. (See Wasservogel v Meyerowitz, 300 NY 125.) Such an issue is not raised on this motion for summary judgment declaring the rider to be unconscionable as applied and need not be reached now.
What can be clearly determined is that it would be unconscionable to permit the enforcement of Rider 3, so as to make the plaintiff subject to rental increases on applications pending when they negotiated and signed the leases but of which they received no notice.
NECESSITY FOR A HEARING PRIOR TO SUMMARY JUDGMENT
The landlord’s final argument is that a determination of the issue of unconscionability may not be made without a hearing. While it might, on occasion, be appropriate to hold a hearing in such cases, section 235-c of the Real Property Law does not require a hearing but only "a reasonable opportunity to present evidence * * * to aid the court in making the determination”. After the extensive pretrial disclosure in this case, such evidence was indeed presented in the papers submitted. Thus, a hearing is not mandated, does not appear to be necessary and no authority has been cited to warrant such conclusion. In any event, with the mass of the information provided, this court is of the opinion that there was "reasonable opportunity to present evidence”.
DECISION
For all of the above reasons, I find that the application of Rider 3, which subjects the plaintiffs to increases ordered on applications pending but unknown to them when they entered their leases, would be unconscionable. Accordingly, summary judgment on the cause of action for declaratory judgment is granted.

 A threshold issue raised in the landlord’s answer and memorandum is whether the plaintiffs, having commenced a CPLR article 78 proceeding challenging the order of the CAB, dated December 15, 1977, are precluded by the determination in the prior article 78 proceeding from maintaining this action. A review of the papers submitted in that article 78 proceeding clearly indicates that it was not in any way determinative of the issues presented on this motion.
One of the grounds asserted in challenging the CAB order was "8. Petitioners assert that they became tenants after the landlord filed his application, that they had not received any notice of the CAB hardship application or order and that the order and proceedings are not binding upon them and therefore they were proceeded against in violation of lawful procedure and prejudiced, and that the order of the CAB is without force and effect against such tenants.”
The affidavit in opposition submitted by the CAB stated: "9. Finally, the petitioners have no valid basis to challenge the Board’s order on the ground that they became tenants after the owner submitted to the Board its application for rent increases on November 25, 1974 or that the owner failed to apprise them of the pendency of the proceeding when they negotiated their leases. Under pertinent Board procedures, every tenant in occupancy when a docket number was issued for the proceeding, was served by the owner, with a copy of the application and the owner so certified on December 27, 1974. Thereafter, it was a question of whether the owner informed a new tenant of the pendency of the application before the Board and that very issue is the subject of a separate action between these tenants and the owner — a suit in which the Board is not a party. The petitioners should not be permitted to interject the identical issue into this Article 78 proceeding.” (Emphasis added.)
Similarly, the affidavit of Ambrose Doskow (attorney for the landlord) dated April 27, 1978, stated in paragraph 6: "It is also conceded that all of them [the plaintiffs in the instant action] had moved into the building after the landlord filed its hardship application. In February 1978 those thirteen tenants, by Mr. Marks, commenced an action in this Court against the landlord in which they seek, among other things, a determination that they are not subject to the CAB order increasing the rents on their apartments * * * The complaint raises an issue as to the effect of a rider to the leases of those tenants. As the annexed affidavit of Mr. Witzling shows, that issue was not decided by the CAB. It is not properly involved in this proceeding to set aside the CAB order.” (Emphasis added.)
Finally, the affidavit of Morton Witzling, dated April 27, 1978, previously referred to, states: "The CAB order of December 15, 1977 so provides, and the effective date of that order as to any particular apartment presents no issue in this proceeding. That issue is raised in the plenary action brought by the present petitioners against the landlord;” (emphasis added).
Accordingly, it is clear from the December 15, 1977 order itself, and the papers submitted in the CPLR article 78 proceeding challenging that order, that the decision of the Appellate Division in confirming the CAB order did not reach the issue involved herein.